## Penn Bank *versus* Frankish.

A bank issued its own check at the request of G., against whose account it was charged. It was presented at the bank by and paid to H. G. was the agent of F., and had fraudulently obtained the check, and F. informed the bank of the fraud and of his suspicion that H. colluded with G. to obtain the money on the check; and accompanied this information with the the request that the bank would not pay the money to H. The bank subsequently paid the money to H., and in a suit therefor by F., the court charged the jury, "if you believe the testimony in regard to G's. transactions, then the burden of proof is on the bank to show that they did pay the money over to a bona fide holder for value." *Held,* that this was error, and the burden of showing that H. was not a bona fide holder rested upon those who asserted it.

October 16th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. GREEN, J., absent.

Error to the Court of Common Pleas, No. 2, of *Allegheny county:* Of October and November Term 1879, No. 219.

Assumpsit by Joseph Frankish, trading as John McKillop & Co., against the Penn Bank. The facts were these:

On the 29th of December 1875, Thomas Gray opened an account with the defendant bank, depositing then, and from time to time subsequently, money and checks on city banks. He also frequently left, for collection on his account, drafts drawn by John McKillop & Co., upon persons in Pittsburgh and the towns in its vicinity. Gray also drew checks from day to day, which were cashed and charged in his account. On the 10th of January 1876, he presented his check for $2300 at the bank's counter, and obtained $100 in money and $2200 in a cashier's check to his own order.

His own check of $2300 was charged to him just as all other paid checks were. On the morning of the 12th of January a stranger came in and asked the cashier whether Thomas Gray had any, and how much, money in the bank. The cashier, Mr. Riddle, asked him by what right he made this inquiry, and was thereupon told that his questioner was Joseph Frankish and was also John McKillop & Co., of Philadelphia; that Gray was superintendent at Pittsburgh, and made collections for the firm there; that he had refused to remit or pay over the amounts collected, and was in default to a large amount. These representations induced Mr. Riddle to furnish a transcript of Gray's account to Mr. Frankish, together with duplicates of Gray's deposit-slips. Mr. Frankish inquired about the $2300 item, and having learned that part of it was represented by an outstanding cashier's check, sat down and wrote and copied, and immediately served on Mr. Riddle this "notice:"

"If the certificate were presented or simply endorsed to or by the following-named parties, viz.: Thomas Gray, J. W. Murray, W. H. Howells, I will take it as a favor to hold, for a short time,

[Penn Bank *v.* Frankish.]

until my attorney, T. S. Parker, 158 Fourth avenue, could be heard from, and the presenting party give an outline of how it came into his possession.

        (Signed,)             JOSEPH FRANKISH.

Pittsburgh, January 12th 1876, 11.20 A. M.

    The Penn Bank, Pittsburgh."

Mr. Riddle said he was "willing to do anything he could to protect Mr. Frankish and save him if he had been wronged," and gave him a letter of introduction to Mr. Oliver, the attorney of the bank, asking his advice as to the course to be pursued. Mr. Frankish carried the letter to Mr. Oliver's office, and they appointed a meeting at the bank in the afternoon.

At this meeting Mr Frankish executed the following bond:

"Know all men by these presents, that I, Joseph Frankish, am held and firmly bound unto the Penn Bank in the sum of $5000, to be paid to said bank, its certain attorney or assigns, to which payment, well and truly to be made, I do bind myself, my heirs, executors or administrators, and every of them, firmly by these presents.

"Witness my hand and seal this 12th of January, A. D. 1875. Whereas, There now remains in the said Penn Bank, a balance of $134.77, to the credit of Thomas Gray;

"And whereas, The said bank, on the 10th of January 1876, issued to the said Gray a cashier's check for the sum of $2200, payable to the order of the said Thomas Gray: and,

"Whereas, It has been sufficiently demonstrated to said bank, that all the moneys at any time on deposit in said bank to the credit of said Gray, were the property of said Frankish; and the said bank, relying on the representations of said Frankish, has agreed to refuse payment of any checks of said Gray which may be presented to it, and to pay over the said balance of $134.77 to said Joseph Frankish; and in case said cashier's check is not presented within one year from this date, to pay over the sum of $2200 to said Frankish. Now the condition of the above obligation is such, that if the said Joseph Frankish, his heirs, executors or administrators, shall do well and truly indemnify, and save harmless the said Penn Bank, its successors or assigns, from any and all loss, costs, damages or expenses (including attorney's fees), that may arise by reason of the payment of said money, or any portion thereof, to said Joseph Frankish, or by reason of any refusal of said bank to pay over said money, or any portion thereof, to said Thomas Gray or his assigns, then this obligation to be void, otherwise to be and remain in full force and virtue.

                          JOSEPH FRANKISH. [SEAL.]

Attest:

    GEORGE T. OLIVER."

[Penn Bank *v.* Frankish.]

On the same day a notice was inserted in the evening papers, warning the public not to receive the check.

Mr. Frankish returned to Philadelphia, leaving in charge of his son the following message for the bank :—

"Should any further drafts now in your hands be paid, please pass to my individual account, kindly notifying me of the names of the payees, which, for the present, can be made through my son Joe.                Yours resp'y,            JOSEPH FRANKISH.
January 12th 1876."

He had no "individual account." His son delivered the message.

Frankish testified that after his return he wrote, or rather signed, a letter to the bank, in which he demanded payment of all he claims here; but there was no evidence that such letter ever reached the bank. After the date of this alleged letter, Mr. Frankish drew on the bank for $475, by a sight draft, of which payment was refused—the amount drawn for being composed not only of the cash that was in the bank when the bond was given, viz., $134.77, but also of certain drafts collected subsequently, and a $75 draft, which was not collected at all, but had been dishonored and returned to Gray on the 7th of January.

After Frankish left the bank on the 12th, the check was presented by W. H. Howells (one of the persons named by Frankish in the request, *supra*), bearing Thomas Gray's genuine endorsement in blank. Mr. Riddle consulted Mr. Oliver, who had remained to attend to other business, after drawing the bond; and as Howells was willing to make affidavit that he held the check for value, Mr. Oliver drew an affidavit to that effect, to which Howells swore before a notary public. The check was presented a few minutes before the bank was closed.

This action was brought for $3286.20, on March 13th 1878.

In the general charge, the court, Ewing, P. J., inter alia, said:

"We have said to you, in answer to the points, that if, as Frankish claims, he not only gave the bank notice of this fraud on him, and that this check was, in fact, drawn on his money, and gave them notice not to pay it to Gray, but to pay it to him, and not to pay it to Howells, giving them as his reason that he had ground for believing that Howells was in collusion with Gray—[if you believe the testimony in regard to Gray's transactions, then the burden of proof is on the bank to show that they did pay the money over to a bona fide holder for value.] Mr. Frankish says he did give such notice. Numerous papers were in evidence on both sides, and the testimony of Mr. Frankish and his son in evidence on one side.

"Upon the other hand, the defendants allege that they did not get any such notice in regard to Howells. They say that

[Penn Bank *v.* Frankish.]

Mr. Frankish did give them notice not to pay it to Gray, but that he told them distinctly that they would have to pay it if any other person than Gray presented it.  Mr. Riddle, Mr. Oliver and Mr. Severance so testify.  In addition, Mr. Oliver, who was counsel for the bank, and who had prepared some of the papers, says that the matter was talked over, and that it was stated by Mr. Frankish and by Mr. Riddle, and that they all agreed if any other person than Gray presented it, it would have to be paid; that the bank could not defend against ·it, and that Mr. Frankish was confident that the check would never be presented, and wanted the money paid over, if it was not presented within a reasonable time; and that the matter was discussed, and a year was fixed upon as a reasonable time in which the money should be held, to see if the check would be presented, and in pursuance of that there was an agreement by which the plaintiff was to get the money then standing to the credit of Gray, if the check was not presented within a year ; that they would pay over the $2200; and Mr. Oliver also says that he drew the bond, which is in evidence, with that understanding among all the parties.

" Mr. Frankish denies that that was the understanding, that any such thing was said, and asserts, on the other hand, that he distinctly notified them not to pay to Mr. Gray, to Mr. Murray or to Mr. Howells, and a notice was served, which, standing alone, is not a notice not to pay to these men, it is simply in the form of a request.

" We have said to you that if you find the facts to be as claimed by the defendants, as testified to by Mr. Riddle, Mr. Oliver and Mr. Severance, then it has to be treated as an agreement by Mr. Frankish, that they should pay over this money on the check, if the check was presented by anybody but Mr. Gray.

" If you believe the testimony of Mr. Frankish, then it throws upon the defendant the burden of showing that Mr. Howells was a bona fide holder of this check for value, and that they were bound to pay it.  As you find the facts you will render your verdict."

Verdict for plaintiff for $3256.29, when defendant took this writ, and alleged, inter alia (14th assignment), that the court erred in the portion of the charge included above in brackets.

*T. M. Marshall* and *Rodgers & Oliver*, for plaintiff in error.— The court below assumed that Howells took the check for an antecedent debt, and that the bank was bound to refuse payment, because his title would not prevail against Mr. Frankish's.  There is no evidence of any admission by Howells that the debt was preexisting.  His affidavit says, " received said check for value;" but even if it had been so, and the bank had known it to be so, that would have been no defence.  Millions of dollars of antecedent

indebtedness are paid daily, in the commercial cities of the country, by means of cashiers' and certified checks, and the very purpose of obtaining them is usually to make a tender that cannot be reasonably objected to. The principle of Phelan v. Moss, 17 P. F. Smith 59; Zimmerman v. Rote, 25 Id. 188; State Bank v. McCoy, 19 Id. 204, and Battles v. Laudenslager, 3 Norris 446, applies with double force to these instruments, which literally pass like money in business circles. The allowance of the rule adopted by the court below, would be a return to the exploded doctrine of Gill v. Cubit, 3 B. & C. 466, and would deprive the paper in question of all its valuable qualities as a convenient currency, by defeating the purpose for which it is issued. We refer on this point to Conger v. Armstrong, 3 Johns. Cas. 5; Atlas Bank v. Doyle, 9 R. I. 76; Walker v. Geisse, 4 Whart. 257; Struthers v. Kendall & Son, 5 Wright 228; Swift v. Tyson, 16 Pet. 1; 1 Dan. on Neg. Inst., sects. 184, 790, note; 783–84, 789–832; 2d vol., sects. 1601–3; 1 Pars. N. & B. 263–64 and 270; Moorhead v. Gilmore, 27 P. F. Smith 118; Bardsley v. Delp, 7 Norris 420; New Orleans Co. v. Montgomery, 5 Otto 16–18; Bank Met. v. N. E. Bank, 6 Howard 512; Merchants' Bank v. State Bank, 10 Wall. 648; Espy v. Bank of Cincinnati, 18 Id. 621.

The court erred in charging that the burden was on the bank, of ascertaining Howells's title to recover, before paying the check and of showing that title on the trial: Pennsylvania Railroad Co.'s Appeal, 5 Norris 80; Putnam v. Sullivan, 4 Mass. 45.

*T. S. Parker* and *Hampton & Dalzell*, for defendant in error.— The payment by the bank was not a good payment: Farmers' and Mechanics' National Bank v. King, 7 P. F. Smith 202. Gray, agent, received money belonging to Frankish, principal. He deposited it in the Penn Bank and took its promissory note for the amount. That note or certified check, call it what you please, belonged to Frankish, and the bank could not pay Gray after being informed of Frankish's superior right. The facts in this case are stronger even than those in the case cited. Here, after being informed of the plaintiff's superior right, the bank promised not only not to pay the agent, but not to pay either one of two other parties, who, it was informed, were in collusion with the defaulting agent. A payment to Gray himself would not have been a good payment. But it is alleged that the payment to Howells was a good payment, because he was a bona fide holder of the bank's obligation without notice of any defence. If the bank expected to defend on that ground it should have made proof of the necessary facts. Having agreed not to pay Howells, it could justify a payment to him only by showing such facts as would have disclosed his unanswerable right to recover against the bank. The presumption of his bona fide ownership of the check had already

been overthrown by explicit notice that the check was fraudulently
issued, and had Howells been making claim against Frankish,
the burden would have been on him undoubtedly to show title:
Hutchinson *v.* Boggs & Kirk, 4 Casey 294.    The bank had no
better title than Howells had.    If Howells had no defence against
Frankish, how could the bank have any?    That the burden of
showing Howells's ownership under the circumstances was on the
defendant seems clear from the ruling of this court in Robinson *v.*
Hodgson, 23 P. F. Smith 210–11.

Mr. Justice PAXSON delivered the opinion of the court, No-
vember 10th 1879.

But for a single error this judgment might have been affirmed.
The learned judge instructed the jury (see 14th assignment) that
" if you believe the testimony in regard to Gray's transactions,
then the burden of proof is on the bank to show that they did
pay the money over to a bona fide holder for value." This was
laying a burden on the bank it was not entitled to bear. The
check in question was the bank's own check, that is, it was issued
by the cashier at the request of Mr. Gray, against whose account
it was charged. The check was strictly commercial paper, and
every holder is presumed to be a holder for value. It was pre-
sented at the counter of the bank by and paid to Mr. Howells.
Does the mere fact that the bank had been informed by Frankish
of Gray's fraud, and of his suspicion that Howells was in collusion
with him, accompanied with a request not to pay the money to
Howells, change the burden of proof? It is conceded that if
Howells was a bona fide holder the payment was good. Against
the legal commercial presumption of his bona fides there was nothing
but the suspicion of Frankish that he was in collusion with Gray.
In addition to the legal presumption referred to there was the affi-
davit of Howells that he received said check for value. If, as was
asserted, it was taken merely as collateral for a pre-existing debt,
the authorities are clear that he would not be a holder for value.
But if taken in payment, or for a new consideration, the case
might be different. This, however, will be a question for considera-
tion upon a new trial in the court below. For the present it is
sufficient to say there was not enough in the case to throw upon the
bank the burden of showing the bona fides of Howells's holding.
It had a right to rely upon the presumption in his favor. The
burden of showing that Howells was not a bona fide holder rests
upon those who assert it.

Judgment reversed and a *venire facias de novo* awarded.